For our next case this morning, Jones v. Anderson. Hello, Your Honors, and may it please the Court. The District Court in Mr. Jones' case aired and should be reversed for two primary reasons. First, the Court aired in failing to appoint Mr. Jones counsel. The District Court did not conduct the required particularized assessment into whether Mr. Jones was able to adequately litigate his case without assistance and whether his case was particularly complex. Second, while the District Court does not need to reach the merits of the case, the District Court also aired in granting summary judgment in favor of defendants on all three of Mr. Jones' claims. As to Mr. Jones' request for assistance of counsel, the District Court was required to conduct a particularized assessment of both the difficulty of Mr. Jones' case as well as his ability to litigate it. The District Court did not do this, instead issuing a boilerplate decision simply concluding that Mr. Jones' claims were not complex and that his pleadings demonstrated that he was able to adequately litigate this case himself. The District Court's opinion failed to address several of the factors raised in Mr. Jones' request for counsel and subsequent follow-up requests to the Court over the four months in between. First, the District Court did not consider the stage of Mr. Jones' case when it ruled on his request for counsel. As this Court has held in James and McCaw, a District Court abuses its discretion when they fail to consider the complexities of advanced stage litigation activities and whether a litigant is able to efficiently handle them. Jones alerted the District Court to the difficulty he was having in obtaining discovery, including getting video evidence and obtaining his medical records, yet the District Court did not even advance the stage of the litigation that the case was in. As this Court held in McCaw, a District Court abuses its discretion when it fails to specifically address whether a plaintiff is able to identify, collect, and present the right types of evidence for his claims. Instead, the District Court simply concluded that his filings demonstrated that he could represent himself. How was he prejudiced here? How was Mr. Jones prejudiced? If the District Court did err in failing to conduct a thorough analysis here as to whether counsel was warranted, what was the prejudice? Sure, so Mr. Jones was prejudiced in several instances. First, if you look at the District Court's opinion and summary judgment, it rejected several of Mr. Jones' claims because it said that he did not submit a verified complaint or declaration. And in fact, he did submit, his second amended complaint was verified, and had Mr. Jones had the assistance of counsel, his counsel either would have pointed the District Court to that verified complaint or helped him submit a declaration. He also was not able to gather any evidence to support his claims? Well, he has the video. You know, I wonder what effect the video has here on any prejudice claims because the only thing that we don't have on the video is his being handcuffed, right? But the video starts right after his handcuffing. And of course, the video appears at least to be inconsistent with his statements regarding broken bones and things like that as a result of the handcuffing. That doesn't really bear itself out as he's put in the chair and wheeled and strip searched, and then he goes and sees the nurse and he complains of bruising on his wrists, and she looks at him and says, there's no bruising. Sure, so the video, we do have video evidence of what happened, as you stated, after he was handcuffed and right before he was put in the restraining chair. However, there is no video evidence of what happened before that. And part of the factors in determining on summary judgment, in this case, whether he had an Eighth Amendment claim includes the destruction that Mr. Jones was causing, whether there was any attempt for the defendants to minimize the use for the need of force, and there's no evidence of what happened. None of that matters if the video conclusively shows that there was no force used, and the video conclusively shows that there was no force used. So the video might conclusively show that there was no force used after the amount of handcuffs, although we would disagree with that given that he had a documented medical history showing that he shouldn't be handcuffed behind his back, that he had shoulder issues, that he couldn't stand. So we would disagree that putting him in handcuffs behind his back, forcing him into a restraint chair, putting him in legs restraints, forcing him to go to undergo a strip search, and then putting him in the RHU unit, a jury could reasonably find that that was excessive given that he posed no physical threat. He simply responded to the defendant's allegations or statements that he needed to go to a cell that he could not access because it had stairs. Mr. Jones's verified complaint states that all he did was say, I can't go to that cell because it has stairs. I have a medical restriction that you need to look at to confirm that. The defendants, in fact, did look at that, did confirm that he had a medical restriction that made it so that he couldn't use stairs, but said, well, that's too bad, and then there was some sort of altercation that resulted in him being handcuffed, but we don't have video evidence of what happened leading up to him being handcuffed. But how could a lawyer have helped him at that point? You know, we don't have video evidence. He said what happened, and at least what he said happened is inconsistent with what we see on the video once the video starts, but what could a lawyer have done for him? Sure, a lawyer could have done several things. A lawyer could have taken the depositions of some of the defendants, particularly Mr. Anderson, to figure out what happened. They could have taken statements from other... Let me ask you one other question on that and the depositions. What do we do with... He asked for a lawyer very early in the proceedings, and the district judge says no. He never asks again. He never goes to the judge and says, okay, now we're in the discovery stage, and I can't obtain medical evidence, or I'm unable to obtain depositions. I can't do depositions. What do we do with that, the fact that he never asks again? Sure. So he requested counsel right after the initial pleadings were filed. The district court then sat on that request and didn't rule on it until four months later. And to go to your question, in this court's concurrence in Pruitt, they specifically stated that once a pro se litigant, in particular one that is incarcerated with no access to the law library and will not understand what the term with or without prejudice will mean, might understandably think that once their motion for recruitment of counsel is denied, that they would be annoying the judge or that they're not allowed to resume that motion or file a renewed request. So at the very least, what the district court judge could have done was put the decision in layman's terms and said something like, if you believe later on in the case that you do require assistance of counsel, you can renew that motion. We're not going to establish a rule like that. That's totally unrealistic. Understandably. But in this case in particular, I think that it's unfair to place the burden on Mr. Jones in this instance to have renewed his motion when, in fact, he couldn't have renewed his motion for the four months that the court was sitting on it. And he did several times do the only thing that he could have done in that instance, which was inform the gathering discovery, that he couldn't get access to his medical records. That was all that he really could have been expected to do at that point. All right. Are you reserving the rest of your time? Yes. Okay. That's fine. Thank you. Mr. Morris. Good morning. May it please the court. Michael Morris on behalf of the defendants and the municipalities. The district court properly grants. May I just start you out? Absolutely. Judge Rovner. Thank you. Look, during the transfer, the search, the placement of Jones in the segregation cell, it appeared, you know, that the officers were physically supporting his weight on the ground. And that he was able to lift himself up once the brace was removed. When they did go downstairs to the cell, the officers appeared to essentially carry him. So what more would be needed to show knowledge on the poor part of the officers that he could not navigate the world at all without his durable medical equipment. And that he would be reduced to crawling on a concrete floor. You know, they saw he was in a brace. They saw he was in a wheelchair. No one goes into prison with that equipment unless someone with a medical degree has deemed it necessary. But they took those things away and they left him to fend for himself in a cell that contained almost nothing. So I was wondering. That's a long way to get to it, but I was wondering why, you know, Hughes versus Joliet Correctional Well, Judge Roedner, I would say, first of all, that, you know, the video also shows, you know, after they placed Jones in the cell without the knee brace, he doesn't fall to the floor. He doesn't complain to Sergeant Anderson that without his knee brace, he can't move around his cell. And he stands there under his own weight and he complains about one thing, and that's that his wrists hurt. So I don't think that it would be fair to impute that sort of knowledge upon the defendants when they're witnessing the defendant stand without any complications after they remove the knee brace. So I think that's the key difference here is, based upon their observations, without his knee brace, he was standing completely fine. So I don't think that the Hughes v. Joliet case is on point here. It was difficult to see what was inside of Jones' cell. Am I correct that the mattress was placed directly on the floor so he would have had to somehow get up from floor level if he needed to go to the toilet or to the door for food? Is that correct? I'm not sure what evidence is in the record about the layout of the cell other than there's a reference in his verified complaint that the mattress is on a concrete slab that's perhaps a couple of feet high. So I'm not sure beyond that what we can infer. He would have had to, yes, get down to get to his bed and get up to obviously get around the cell. But again, what we see from the video is there's no reason for any of the defendants, after they removed the knee brace, for them to suspect he's going to be crawling around his cell. I would also question whether, as a matter of law, that given the duration of time that he's in this cell, it's a mere two days until he's placed back in general population, presumably with his necessary equipment, that that, as a matter of law, would rise to an amendment violation. See, that video, it seems that from the video that he wasn't physically capable of walking independently up or down stairs, as he told the officers. And again, he's in a wheelchair. I mean, does the record tell us how or why he was placed in a prison where access to every cell required the use of stairs? Is he still there? Judge Roggeman, I think the short answer to your question is no, we don't know how we I'm also not sure that there's anything in the record other than a reference in his verified complaint to a wheelchair. He certainly wasn't in a wheelchair when the video starts. I don't know that it certainly seems inconsistent with the record that he had a wheelchair. But I'm not, and to answer the other question, I'm not sure where he is now. But, you know, in addition to sort of, you know, as a legal threshold, I don't think this rises to an eighth amendment violation. There's also no evidence that he complained to anyone about the conditions of his cell. And, you know, like I said before, Judge, you know, the only complaint that he does make after he removes his knee brace is about his wrists. So I think that also belies his claim. And the video is equally clear with respect to his other two claims. It clearly shows that the amount of force was, in my view, de minimis, but certainly, I think, tailored to the situation, which was that an unruly inmate who was disobeying orders and that we had to be transported in a safe way for everyone to restrictive housing. The entirety of the search is on videotape. Three male officers searched him. The lone female officer was standing in the back. Her view was occluded by, I counted, four different male officers. At no point did he complain about Sergeant Dutton's presence. Despite knowing about it, she was there from the very beginning when the video first starts playing. She's there. She walks next to him the entire time outside the prison yard as they're transporting him. The search lasted for less than a minute. As soon as it's over, Sergeant Anderson hands him a towel. There was a brief moment when they're transferring him into his cell when the towel drops. They immediately pick the towel up, and you can see Anderson blocking the view of Dutton. There's clearly no evidence that the legitimate search was done in a way to harass Mr. Jones. So given the objective evidence in this case, including the videotape, the district court properly granted summary judgment, and there's just simply nothing that an attorney, had one been appointed, could have done in the face of such evidence. You see, the one thing that I'm just a bit, I mean, I am conflicted about is the idea of removing someone's leg brace and which had to come through a medical professional and just sort of leaving him in that cell. I mean, you say only two days, but my goodness, if you had to crawl around, not you, but if one had to crawl around a cell for two days. I mean, can you help me with it? Yeah, my best response to that, you know, I understand your point. My best response to that would be, you know, in the interests of institutional security inside this controlled status, you have to take that stuff away. Perhaps unless, you know, as soon as they do, it's very clear that he's going to be suffering in pain. That's not the case here. They did not see anything. There's nothing on the video to indicate that. So I think that this is a clear call for me. But perhaps in a different case, I could see that there being some need for an exception there. I don't think that's the case here. And so that's the best answer I can give you on that, Judge. Do we know why he was wearing a knee brace? I do not. The record doesn't say anything about that? There's nothing in the record about specifically why he's wearing a knee brace. He makes complaints about, I think he was hit by a train. He had some, you know, he has an extensive medical history. I'm not sure exactly why the knee brace. I'm sorry. And we don't, and nothing is other than his testimony will tell us whether or not there was a wheelchair. Is that correct? That's correct. That's correct, Your Honor. Other than that one reference, I don't know. Do you think he, I mean, what were they worried about with the brace in the cell? That he'd use it as a weapon of some sort? I think they were just following standard prison procedure. Anytime an inmate is transferred into this controlled status where inmates are obviously placed, this is a disciplinary segregation facility within the prison where inmates are transferred when they misbehave or they pose a danger to staff or themselves, that their initial, everyone is initially treated the same. They're just given a smock and through good behavior they can earn other property, but he was treated like everyone else in that situation and that's why, Your Honor. And I see my time is up unless there are any other questions. I thank the court and I would ask that it affirm the district court's judgment. Thank you. Thank you for answering my questions. Ms. Steigert. Hello. Judge Robner, just going back to your conditions of confinement questions, I want to reiterate your point that the defendants took away my client's documented necessary medical equipment when they placed him in this cell, so I would agree with you that opposing counsel's statement that it was only two days, while the duration of time is one factor, it is only one factor in the overall scheme of what everyone should be looking at, and especially when it comes to adaptive medical equipment, I would agree with you that any duration of time where you have to crawl around on a cell floor to access your food or to get to your bed could be considered sufficient. And these are all facts that should have gone to a jury. And particularly here, there is a special handling summary that says that my client requires this adaptive medical equipment. These defendants took that equipment away and placed him in a cell for over 48 hours without that equipment, and the fact that the court then placed the burden on my client to make a complaint is not the standard here. And then again, going back to opposing counsel's statement about Officer Dutton's presence being simply peripheral, again, I would disagree with her presence being peripheral. She was videotaping the entire altercation, including when my client had his buttocks searched. He was given a towel, but it was too small to cover his genitals, and it dropped multiple times, exposing him, which he testified to in his verified second amended complaint. And if we look at the Secretary's decision, which the district court completely failed to acknowledge at all and which is quoted in my client's verified second amended complaint, the Secretary's decision actually states that they believe that Officer Dutton's presence was not necessary because no emergency existed in this instance, and that's evidence that again should have gone to the jury. Thank you. Thank you. Our thanks to both counsel. The case is taken under advisement.